IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                              No. 1:21-cr-10120-JDB-1

CHRISTOPHER STEVEN MCCASLIN,

     Defendant.

_____

ORDER UPHOLDING DEFENDANT'S OBJECTION TO PRESENTENCE
INVESTIGATION REPORT RECOMMENDATION FOR CROSS-REFERENCE TO
ATTEMPTED SECOND-DEGREE MURDER
_____

On July 27, 2021, the Defendant, Christopher Steven McCaslin, and an individual

identified as Tommy Rhea were involved in an altercation during the course of which both

sustained gunshot wounds.  (*See* Docket Entry ("D.E.") 27.)  Following an investigation, McCaslin

was indicted on December 14, 2021, for being a felon in possession of a firearm in violation of 18

U.S.C. § 922(g)(1).  (D.E. 2.)  He pleaded guilty to the charge in April of the following year.  (D.E.

23-24.)

Defendant's presentence investigation report (the "PSR"), prepared June 23, 2022 (D.E.

27), began its calculation of his total offense level with § 2K2.1 of the United States Sentencing

Guidelines ("U.S.S.G." or the "Guidelines"), applicable to § 922(g) convictions.  In *United States*

*v. James*, 575 F. App'x 588 (6th Cir. 2014), the Sixth Circuit explained the relevant process for

navigating the Guidelines to reach a conclusion regarding sentencing:

> [Section 2K2.1] assigns an offense level for a defendant convicted of unlawful
> possession of firearms.  Ordinarily, defendants receive a base offense level of [14]
> if they [were a prohibited person at the time the defendant committed the instant
> offense. § 2K2.1(a)(6).]  But § 2K2.1 also provides for a "cross-reference," under
> which the sentencing court must apply U.S.S.G. § 2X1.1 "[i]f the defendant used

or possessed any firearm . . . in connection with the commission or attempted commission of another offense." § 2K2.1(c)(1)(A). The [Guidelines] Manual defines "another offense" as "any federal, state, or local offense regardless of whether a criminal charge was brought, or a conviction obtained." § 2K2.1 cmt. n.14(C).

Section 2X1.1, in turn, assigns offense levels for offenses of attempt, solicitation, or conspiracy not covered by a specific offense guideline. § 2X1.1(b). This section, furthermore, contains its own cross-reference provision: "When an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section," the sentencing court must apply *that* guideline section. § 2X1.1(c). Because § 2A2.1 expressly covers the offense of attempted murder, a sentencing court must apply that section rather than § 2X1.1(b). Under § 2A2.1, a defendant receives a base offense level of 27 for attempted second-degree murder. § 2A2.1(a)(2).

*James*, 575 F. App'x at 591-92 (internal footnote omitted) (some ellipses in original); *see also* U.S.S.G. § 2K2.1(a)(6).

Based on statements provided to officers by Elizabeth Johnson, who was present at the scene of the shootings, and Rhea, the report identified the other offense as one covered by § 2A2.1's attempted murder Guideline and assigned a base offense level of 27. The report also applied a two-level increase for serious bodily injury to Rhea pursuant to U.S.S.G. § 2A2.1(b)(1)(B). With a total offense level, after a three-level reduction for acceptance of responsibility, of 26, the PSR recommended imposition of the statutory maximum sentence of 120 months' imprisonment, when calculated along with Defendant's criminal history category of VI.

In her position paper regarding sentencing filed September 14, 2022, Defendant's attorney challenged the PSR's application of the cross-reference and the two-level serious bodily injury increase.[1]   (D.E. 32.) On September 20, 2022, an addendum to the PSR was issued addressing counsel's objections. (D.E. 34.) The Court conducted a sentencing hearing on September 21,

---

[1]The Government offered no objection to the PSR. (D.E. 26.)

2022, at which it heard testimony from witnesses on behalf of the Government and the Defendant. (D.E. 35.)  At the conclusion of the hearing, the Court directed the parties to submit briefs on their respective positions.  As the briefs have been filed (D.E. 42-43), the questions raised are ripe for disposition.

At the outset, the Court notes that the Government's brief, filed October 18, 2022, (D.E. 42) contained argument relative to both objections contained in Defendant's position paper, while McCaslin's brief, filed three days later, (D.E. 43) addressed only the cross-reference, making no mention of the serious bodily injury enhancement.  The Court assumes from the omission that McCaslin has abandoned his previous objection on that point.  Accordingly, the remainder of this opinion will focus solely on the cross-reference.

Section 2K2.1's cross-reference provision "allows a district court to consider what the defendant's sentence would have been for crimes other than the firearm possession, and use the higher of the two offense levels to compute the sentence." *United States v. Howell*, 17 F.4th 673, 690 (6th Cir. 2021) (quoting *United States v. Smith*, 196 F.3d 676, 685 (6th Cir. 1999)).  "District courts may cross-reference under § 2K2.1 only where a preponderance of the evidence supports the conclusion that the defendant committed or attempted to commit the offense that provides the cross-reference," *United States v. Woodley*, 727 F. App'x 136, 140 (6th Cir. 2018) (quoting *United States v. Frost*, 521 F. App'x 484, 490 (6th Cir. 2013)), and that no defense applies, *United States v. Walker*, 858 F. App'x 857, 860 (6th Cir. 2021).  The burden lies with the Government to make such a showing.  *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013).

McCaslin objects to application of the cross-reference on the grounds that he acted in self-defense when he shot Rhea.  "In the context of sentencing, [the court is to] consider whether a

state's justification law bars application of [an] enhancement[.]"[2]  *United States v. Neal*, 627 F.

App'x 543, 546 (6th Cir. 2015).  Under Tennessee law, "justification is a 'defense to prosecution'

for otherwise unlawful conduct."  *Id.* (citing Tenn. Code Ann. § 39-11-601).  Tennessee's self-

defense statute provides:

> [A] person who is not engaged in conduct that would constitute a felony . . . and is
> in a place where the person has a right to be has no duty to retreat before threatening
> or using force against another person when and to the degree the person reasonably
> believes the force is immediately necessary to protect against the other's use or
> attempted use of unlawful force.

> [A] person who is not engaged in conduct that would constitute a felony . . . and is
> in a place where the person has a right to be has no duty to retreat before threatening
> or using force intended or likely to cause death or serious bodily injury, if:

>> The person has a reasonable belief that there is an imminent danger of death[
>> or] serious bodily injury[.]

>> The danger creating the belief of imminent death[ or] serious bodily injury
>> . . . is real, or honestly believed to be real at the time; and

>> The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(1)-(2).

It is undisputed that being a felon in possession of a firearm constitutes unlawful activity

in Tennessee.  *See State v. Perrier*, 536 S.W.3d 388, 409 (Tenn. 2017).  Thus, McCaslin, as one

engaging in such activity, had a duty to retreat.  *See id.* at 401.  That said, "a duty to retreat does

not mean that a person cannot defend . . . himself[;] [he] may still defend himself even to the point

of using deadly force" where self-defense is found justifiable.  *Id.* at 404; *see also State v. Simpson*,

No. M2021-01031-CCA-R3-CD, 2022 WL 16544456, at *13 (Tenn. Ct. App. Oct. 31, 2022)

---

[2]The *Neal* court recognized that it is permissible for a defendant to raise a state-law
justification defense for the purpose of challenging a federal sentence enhancement, citing *United
States v. Adkins*, 729 F.3d 559, 564-65 (6th Cir. 2013).  *Neal*, 627 F. App'x at 546.

(same).  The defense "implies no license for the initiation of a confrontation or an unreasonable escalation of a confrontation in progress."  *Neal*, 627 F. App'x at 546-47 (quoting *State v. Renner*, 912 S.W.2d  701, 704 (Tenn. 1995)).  As previously noted, "[a]t sentencing, the [G]overnment has the burden to prove the absence of any defense by a preponderance of the evidence."  *Walker*, 858 F. App'x at 861 (quoting *United States v. Betts*, 509 F.3d 441, 445 (6th Cir. 2007)) (internal quotation marks omitted).

The PSR and its addenda, based on the statements of Rhea and Johnson, concluded that McCaslin appeared to be the aggressor and, therefore, any claim of self-defense was unjustified. During the Government's proof at the hearing, the statements were read into the record by the Tennessee Bureau of Investigation ("TBI") agents who took them, as both Rhea and Johnson had died since the incident.[3]  Special Agent Kim Covington interviewed Rhea at the hospital where he was receiving treatment for his ankle wound on the day of the shooting.  His statement was recorded and transcribed by her, and then read and digitally signed by Rhea in her presence.  The statement was as follows:

> Elizabeth needed clothes, so I went over to pick her up at her house.  Chris was supposed to go with us.  I walked inside.  Everything was cool.  I sat down and talked to Baco Baker and Jen.  They were sitting on the couch.  I noticed Chris was asleep in the chair to the left.  I cut up with Baker a bit.
>
> Elizabeth showered and got ready.  After we talked, Elizabeth tried to wake up Chris.  Seemed like he was playing being asleep.  He finally woke up and said, just go without me.
>
> She came outside and said she wasn't going to go.  I got in my truck, a purplish Ford F-150.  Jen and Elizabeth were talking outside.  Elizabeth walked back inside. Jen opened up the door and said, wait one minute, she's going with you.  I waited a few minutes.  And she got into the truck and we headed off.
>
> We went to another friend's house.  Elizabeth was looking through the clothes at

---

[3]Neither death was related to the events at issue here.

the house.  After she picked out what she wanted, she either called Chris or Chris called her, and she got upset.  We drove back.

Chris said on the phone that he would chop my head off if I go over there.  He was sending me threatening texts.  He was texting, don't bring the whore here.

I thought he was just posturing.  I thought when I got there we might scuffle a bit. When we pulled up, we met in front of my truck, talked a little bit.  Then Chris said, never ever take my lady anywhere no matter what I say or what she says.

He reached into his right cargo pocket and pulled out a very large, what appeared to be a musket.  He pointed it at me and then pointed it to my right.  He shot once. I thought he shot my truck.

I reached [for] my pistol in my right back pocket.  He cocked the hammer and put it to my nose.  He said, go for it.  I have one more left.

I told him to please get the gun out of my face.  I grabbed the pistol and forced it to my right and pulled my pistol.  I did not shoot.  I shoved him back.

He ran with his back to me.  I was in a shooter's stance.  He ran around the corner of the house.  I stood there waiting.  I knew he was going to pop his head out.  He did.  He pointed the gun at me.  And I believe he shot a second time at me.  And I returned fire, either two or three shots.

He fled around the corner of the house.  I stood there waiting.  I thought he was going to ambush me.  I started to go to my truck to leave.  I was at the corner of the house and saw him against the shed.  He had his gun pointed down.

He picked the pistol up and fired at me one time.  I got hit in the left ankle.  I fired one round as I was falling.

We were 20 yards away from each other.  I yelled for Elizabeth to call 911.  She said she couldn't.  I said, why can't you.  He just shot me.  I couldn't understand her.

I crawled back to my truck and called 911. . .  The magazine was empty after I fired my rounds.

(D.E. 38 at PageID 146-48.)

Covington further testified that she had been sent to the hospital facility in Memphis,

Tennessee, to which McCaslin and Rhea had been airlifted,[4] to obtain statements from both men. With respect to the Defendant, Covington recalled that she "kept trying to talk to him, but his eyes were closed, he just wasn't responding[.]" (*Id.* at PageID 139.) She determined that he could not be interviewed. On cross-examination, Covington acknowledged that McCaslin, who had been shot in the neck, appeared to be more seriously wounded than Rhea and that he had likely received some type of medication prior to her attempt to conduct an interview.

TBI Agent Bryant Allen took Johnson's statement at the scene about forty minutes after the shooting occurred. He described her as "very excited." (*Id.* at PageID 158-59.) Allen recorded her narrative and took handwritten notes. The statement read into the record at the hearing follows:

> Christopher McCaslin has silver handgun standing beside house between air conditioning and swing.
>
> Me and Tommy had went to get clothes. We left at 1:54 a.m. No, 2:00. And then she said 3:00 a.m.
>
> Says, we were gone six hours. Tommy worked on car at 35 Old Stage Road, Lindsey's house. I was going through clothes. Nick Luther was there.
>
> Chris starts texting me. He is mad. He said, it's over and we are done. He accused me of sleeping with Tommy when we are alone.
>
> Last night he grabbed me by the throat. He made up a lie about Tommy texting him that me and Tommy had sex.
>
> We come home. Tommy is in driver's seat. I'm getting out my clothes. I see Chris standing at the door.
>
> When I look up, they both have guns pointed at each other. I told Chris to stop. They still had guns pointed at each other. I told them to stop. I don't know who shot first. They were arguing, calling each other names. I heard a shot.
>
> Tommy was shooting at Chris's feet. He ran around the house. Chris shot Tommy in leg. Tommy sat up and shot Chris in neck.

---

[4]The hospital, Regional One Health, is the only Level 1 trauma center in the mid-south region. https://regionalonehealth.org/discover-us/ (last visited Nov. 9, 2022).

(*Id.* at PageID 157-58.)

The Court also heard testimony from three individuals called by Defendant—Wade Holloway, Rebecca Randle, and McCaslin himself.  Holloway, at the time of his testimony an inmate at the Carroll County, Tennessee, jail, described himself as a friend of McCaslin of more than ten years.  He was likewise acquainted with Rhea.  The witness recalled that, in June 2021, he was at Rhea's home when Rhea asked him to accompany him to an undisclosed location because he needed Holloway's help.  When they arrived at the destination—McCaslin's home—in Rhea's truck, Johnson and Defendant were in the yard.  Johnson was naked, swinging an axe at McCaslin, and "[a]cting crazy" while he appeared to be attempting to defend himself from her.  (*Id.* at PageID 165.)  Rhea exited his truck with a pistol, which he pointed at Defendant, and walked toward him saying he was going to shoot.  McCaslin, who was unarmed, said something to the effect of "he didn't have a problem" and was just trying to "get her gone."  (*Id.* at PageID 164.)  Although Rhea eventually put his gun away, he and McCaslin continued to argue.  Holloway tried to deescalate the situation by physically picking Johnson up and placing her in the house and telling Rhea they needed to leave.  He remembered Rhea being upset with him for leaving the woman behind.  The witness added that Rhea "normally carried a gun around" and that he had never seen Defendant with one.  (*Id.* at PageID 168.)

Randle lived approximately five miles from McCaslin and had known him for over twenty years.  She testified that he phoned her at around 4:30 a.m. the day of the shootings sounding "desperate" and begged her to come get him.  (*Id.* at PageID 170.)  He told her Johnson had left the house with Rhea and that they planned to return.  He did not want to be at the house because Rhea had "held a gun to him twice prior to that."  (*Id.* at PageID 171.)  Although Randle promised

to pick him up later in the day after she ran errands for her son's birthday, she was informed of the shooting and McCaslin's transport to a hospital before she could do so.  She did not see or speak with him again that day.

McCaslin and Johnson had been in an on-and-off romantic relationship and had lived together at his residence for a period of time.  He and Rhea had been friendly until the latter pulled a weapon on him, after which Rhea was no longer welcome at McCaslin's home.

Defendant explained that he had a "bad feeling" when he woke up on July 27, 2021.  (*Id.* at PageID 179.)  He texted Johnson, who was with Rhea.  Defendant told her not to come back to his house but she responded that she had clothing there.  Rhea got on the line and began arguing with McCaslin and threatening him, stating that he and Johnson were coming to the residence. Defendant then called Randle for help because he wanted to avoid a confrontation with the two. After making the call, he went back to sleep for approximately two more hours, not knowing when, or if, they would actually appear.

During that period, McCaslin was apparently receiving calls and text messages from Rhea and Johnson, some of which were threatening.  In one message, Elizabeth advised Defendant that she would be at his home in ten minutes and that Rhea would be with her.  Defendant's grandfather, with whom he was estranged, lived across the road.  While his grandfather was taking a bath that morning, McCaslin entered his home and took a single shot firearm, described in the indictment as a Lasserre SA, Model Super Comanche, 45/410 caliber pistol, along with two, perhaps three, bullets, that he knew were kept in the dining room.  He put one of the bullets in the gun and the other in his pocket.

Rhea and Johnson arrived at McCaslin's house some five minutes later.  At that time, Defendant was standing in his glass-enclosed porch.  As Rhea's truck entered the driveway,

9

McCaslin stepped outside.  Rhea and Johnson exited the truck and Johnson began getting clothes. Defendant asked them to leave but Rhea, who McCaslin knew was carrying a pistol in his waistband, refused.  Defendant turned to say something to Johnson and when he turned back around, he saw that Rhea had drawn his weapon and was pointing it at him.  As Defendant pulled his grandfather's gun, Rhea began shooting at his legs.

McCaslin testified that he turned and ran around the side of his house to retreat.  Since there was only open field behind the structure, however, he decided to make a run for his tractor barn, which offered cover.  As he did so, Rhea advanced closer to the house.  At one point, the two were approximately fifteen feet from one another.  Rhea began firing again and McCaslin again turned to flee.  Without aiming, and while Rhea was still firing at him, he pointed his gun in Rhea's direction and took a "blind shot."  (*Id.* at PageID 194.)  Defendant had no idea at first whether he had struck the other man.

The Court begins its application of the law to the evidence presented in this matter by noting that the probation officer who prepared the PSR did not have the benefit of McCaslin's side of the story.  Indeed, the officer stated in the PSR that Defendant "would not wake up or speak to the agent" (D.E. 27 at PageID 80) and similarly in the September 20, 2022, addendum that "[i]t should also be noted that special agents attempted to interview the defendant, but he would not speak with them" (D.E. 34 at PageID 125).  To the extent the probation officer interpreted Defendant's failure to speak to the TBI as a conscious refusal on his part to cooperate with law enforcement and drew any negative inferences based on that interpretation, Covington's testimony suggests that, because of his more serious injury and the treatment he had received, he was unable, rather than unwilling, to give a statement.

In any case, in its post-hearing brief, the Government does not appear, as did the probation

officer, to characterize McCaslin as the initial aggressor in the incident.  It acknowledges that McCaslin retreated from Rhea, as he was required to do under the Tennessee statute, by fleeing to the rear of his house.  At that point, Plaintiff posits, Defendant was safe and the confrontation was over.  Had Rhea pursued him behind the residence, the Government avers, McCaslin would have been justified in using a firearm to defend himself.  Instead, the Government's submits, he launched a second, separate confrontation by leaving the safety of his retreat to "re-enter[] the fray" and "initiate[] gunfire with Rhea," thereby negating any claim of self-defense.  (D.E. 42 at PageID 210.)

However, the entirety of the record does not, in the Court's view, support Plaintiff's interpretation of the evidence presented.  Although the Court has summarized McCaslin's hearing narrative regarding the exchange of gunfire that resulted in injury previously herein, a recitation of the specific testimony is warranted here:

> But I ran around the side of the house to retreat, but there was only open field back that way.  So I've got a tractor barn that's on this side of the house, which I was going to try to get to.
>
> And as I'm coming, there is probably about as much space between my house, the corner of my house, and the tractor barn that I need to get to in plain sight of Tommy, that I can get to some cover maybe.
>
> And as I'm going across that, he done come a little closer to my front door.  And right at the corner of the house we—we're point blank, maybe 15 feet away from each other.  And he starts firing again.
>
> And that's when I turned to flee.  And I—I didn't aim, I just pointed it towards Tommy and pulled the trigger as he's firing at me.  And he hits me from the back, and hits me in the back of the neck. . . .

(D.E. 38 at PageID 185-86.)  The Government insists based on this testimony that Rhea was moving closer to where his truck was parked and not in Defendant's direction.  However, it is somewhat unclear from the quoted testimony whether the men were moving toward or away from

each other around the house.  Perhaps in an effort to provide some clarification, McCaslin's attorney then asked him whether, as he started to move away toward the tractor barn, Rhea *advanced toward him* and if the next time Rhea fired, prior to the shot fired by Defendant, the two were closer together.  Defendant's affirmative response to that inquiry went unchallenged by the Government on cross-examination.  Moreover, the Government completely fails to address in its argument McCaslin's testimony, which the Court credits, that Rhea had begun firing at him and was continuing to fire, ultimately emptying his magazine, when Defendant took the shot that injured Rhea.

Based on the foregoing, the Court finds that the Government has failed to demonstrate by a preponderance of the evidence that McCaslin did not shoot Rhea in self-defense or, therefore, that the cross-reference to attempted second-degree murder should be applied.  Defendant's objection to the cross-reference is therefore sustained.

Further, in its brief, the Government argues that, in the event the Court upheld Defendant's objection to application of the cross-reference to attempted second-degree murder, there is sufficient evidence to support a cross-reference to aggravated assault under U.S.S.G. § 2A2.2.  As Defendant failed to address this argument in his brief, he is permitted ten days in which to respond to the Government's alternative assertion or advise the Court that he has no objection thereto.

IT IS SO ORDERED this 14th day of November 2022.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE